UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| RONALD BURNS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 20-044-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| BERRY GLOBAL, INC., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Ronald Burns, who is African American, was employed by Defendant Berry Global, Inc., ("Berry") for a little over a year. His tenure was marred by four instances of covert racial harassment. In one month alone, Burns discovered an offensive note, a noose, and a written threat in his personal locker. Understandably, he was deeply troubled by these incidents. Berry was also disturbed by the allegations, and its managers investigated the incidents. As the number of incidents increased, so, too, did Berry's efforts to root out the perpetrator. Unfortunately, the harasser was never identified. Two months after the fourth incident, Burns reluctantly resigned.

With this lawsuit, Burns does not seek to hold the racist accountable. Rather, he filed suit against his former employer for failing to identify the perpetrator. Berry's motion for summary judgment is now pending. The question raised by the motion is not whether the actions directed at Burns should go unanswered (they should not), but whether Berry must answer for them. On this specific question, the Court concludes that Berry's investigative

efforts were sufficient, despite their lack of success.  As a result, summary judgment will be entered in its favor.

## I.    THE RELEVANT FACTS[1]

Burns began working as a maintenance technician at Berry's Nicholasville, Kentucky manufacturing plant ("the facility") in January 2018.  [Record Nos. 1, ¶¶ 11-12; 32-14, p. 16, 23]  He was initially employed by Aerotek, a temporary employment agency that contracted with Berry.  [*See* Record No. 32-14, pp. 15-16.]  According to Burns, his duties were broad— maintenance technicians did simply "whatever needed to be done around the plant."  [*Id.* at p. 24]  To Burns' delight, Berry "reeled [him] in and brought [him] in full time" in August 2018.[2] [*Id.* at p. 24-25]  He did not have to apply or interview to secure the full-time position, nor did his employment schedule, supervisor, or duties change.  [*Id.* at pp. 30-31]

The facility employed around fifty people, many of whom comprised four production shifts that manufacture plastic film 24 hours a day.  [Record No. 32-20, p. 40; 30-3, p. 16]  The shifts worked either 8:00 a.m. to 8:00 p.m. or 8:00 p.m. to 8:00 a.m.  [Record No. 30-3, p. 17]  Shifts 1 and 2 generally worked the daytime shift, while shifts 3 and 4 worked the night shift. [*Id.*]  Additionally, the facility employed around five maintenance technicians during Burns'

---

[1]    At the summary judgment stage, the Court views the evidence in the light most favorable to the nonmoving party and draws inferences in its favor.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  Thus, the following facts are established in Burns' favor.

[2]    The exact date of Burns' full-time employment is unclear.  He acknowledged receipt of an Employee Handbook on July 19, 2018, but the Complaint alleges his employment did not begin until August 6, 2018.  [Record Nos. 1, ¶ 11; 30-2, p. 239]  Burns stated that he believes his employment began on August 1, 2018.  [Record No. 32-14, p. 34] For the purposes of this motion, Berry concedes that his full-time employment began "on or around August 6, 2018."  [Record No. 30-1, p. 2]

tenure.  [Record No. 32-14, p. 17] They split shifts as follows: two maintenance technicians worked during the day shift, and the night shift maintenance technician worked alone.  [*Id.* at p. 28] Burns chose to work the night shift.  [*Id.* at p. 25]

### A.    Incident one: an offensive note is discovered in Burns' locker.

Burns returned to his locker at the end of his shift on August 7, 2018, and found a piece of cardboard with "Dance Monkey" written on it ("the offensive note").[3]  [Record Nos. 30-3, p. 55; 32-15, p. 35; 32-21, p. 2]  On his way out of the facility, he stopped by John Edwards' office and showed him the note.  [Record Nos. 32-14, p. 38; 30-3, p. 52] Edwards was the plant manager.  Burns relayed to Edwards that he discovered the offensive note around 8:45 a.m., and that he was confident it was not there the night before.  [Record No. 32-14, p. 35] Edwards asked Burns how he interpreted the note, and whether he thought it might be "slang" or a "prank."  [*Id.* at p. 82] Edwards also stated his belief that Burns could "handle [his] own if there was a situation that occurred and someone wanted to be physical."[4]  [*Id.*]  Burns did not indicate that he believed the note was racially motivated, but Edwards reported the matter to Jamie Long, the facility's Human Resources Generalist.  [*Id.* at p. 43; Record No. 30-3, pp. 53-54]

---

[3]     Berry indicates that, "at all times relevant to its investigation, Berry understood the note was found on the floor outside of Burns' locker."  [Record No. 30-1, p. 4]  Although this understanding is corroborated by other evidence in the record, [*see* Record Nos. 30-7, p. 2 (EEOC Charge); 32-21, p. 2 (Long's notes)], the location of the note is not material to the disposition of Berry's motion.

[4]     Edwards disputed that he meant to undermine Burns' concerns, but he did not dispute saying something to the effect that Burns can "take care of [him]self" at some point.  [Record No. 30-3, pp. 107-08]

Edwards, Long, and Charlie Bowman (Burns' supervisor), began investigating the offensive note. [Record Nos. 30-3, p. 56; 32-20, p. 133] Employees on shift 3 were coming offline when Burns discovered the note on August 7, 2018. [Record Nos. 30-3, p. 58; 32-14, p. 37] Thus, Edwards met with shift 3 the following morning and "advised this type of harassment would not be tolerated."[5] [Record No. 32-21, p. 2; *see also* Record Nos. 30-3, pp. 57-58; 32-20, p. 135; 30-6, p. 281.] For her part, Long initially contacted Sharon Johnson, the Human Resources Manager and her direct superior, to discuss the situation. [Record No. 32-20, p. 129] Long and Bowman then began reviewing security camera footage to determine who entered the locker room prior to Burns discovering the offensive note. [Record No. 32-20, p. 133] One of the facility's security camera partially captured employees entering and exiting the men's restroom, which leads to the locker room. However, employees were only visible from the waist down. [*See* Record Nos. 30-3, p. 58; 32-14, p. 58; 32-20, pp. 133-34.] As a result, Long spent "several days" attempting to match the outfits of employees entering the restroom to footage from other areas of the plant. [Record No. 32-20, pp. 133-35]

At a maintenance team meeting on August 8, 2018, Bowman informed Burns that Berry was reviewing camera footage to determine who may have placed the note in his locker.[6]

---

[5]     Burns' response to the current motion states that he "denies that this meeting occurred." [Record No. 32, p. 5] However, the response incorrectly cites to a portion of Burns' deposition unrelated to Edwards' alleged meeting with the third shift. [*See* Record No. 32-14, p. 48 (discussing Burns' conversations with other employees following the offensive note).] When asked about the meeting, Burns merely stated that he "didn't witness" it. [*Id.* at pp. 43-44] Thus, Burns did not testify to having direct knowledge of whether the meetings occurred.

[6]     Another supervisor at the facility, Donnie Conatser, had apparently suggested to Burns that reviewing the camera footage would be futile because the cameras only broadcasted a live feed. [Record No. 32-14, pp. 44-45] Bowman cleared up this incorrect statement when he informed Burns that the footage, in fact, was recorded. [*Id.* at p. 47]

[Record No. 32-14, pp. 47-48] However, no suspects were identified or interviewed over the next three days.  [Record Nos. 30-3, p. 62; 32-20, pp. 135]

### B.    Incident two: a noose is discovered hanging on Burns' locker.

Burns gathered his belongings from his locker on August 11, 2018, when his shift ended around 8:00 a.m.  [Record No. 32-14, p. 50] But before he could leave, Burns received a text message from the day shift maintenance technician: he was going to be late and Burns needed to cover for him.  [*Id.*]  Burns returned to the production floor for approximately an hour.  [*Id.*] He discovered a rope hanging on his locker when his shift finally ended.  [*Id.*]  The rope was tied with a knot that left a large loop at the end, similar to a noose ("the first noose").[7]  [*Id.*; *see* Record No. 30-3, p. 65]  Burns took a photo of the first noose hanging on the locker and attempted to notify a supervisor.  [Record No. 32-14, pp. 51-53]  Because Bowman was not in his office, Burns looked for the "next person with authority or supervision."[8]  [*Id.* at p. 53]  He found Jeff Bell, the day shift production supervisor, and the two removed the noose from the locker.  [*Id.* at pp. 53-54]

Burns then reported the incident "up the chain of command."  [Record No. 32-14, p. 54] First, he sent Long a picture of the noose.  [*Id.*]  Long then called Burns to get more information.  [*Id.* at pp. 55-56; Record No. 32-21, p. 2; 32-20, p. 133, 136] Burns recounted the details of the incident during this conversation, requested the number for Berry's ethics

---

[7]     Other Berry employees testified that the rope is a shortened version of a slipknot commonly used in the facility's production process.  [Record Nos. 30-3, pp. 62-63; 32-20, pp. 208-09; 32-34, pp. 60-62] However, they unanimously conceded that the rope had no place in a locker room, and they agreed that it would be considered highly offensive under the circumstances.

[8]     The first noose was discovered on a Saturday morning, so much of the facility's management was absent.

hotline, and asked that Long look into the situation. [*Id.* at p. 56] Long then reported the incident to Edwards, who also called Burns. [*Id.*] Burns later called the ethics hotline and reported the incident. [*Id.* at p. 59; *see also* Record No. 32-14, pp. 265-69] At some point after the first noose incident, Edwards allegedly told Burns to continue to "come into work, be safe, kind of keep [his] head down, and pretty much keep quiet about the situation." [*Id.* at p. 63] Burns was granted leave for the remaining two shifts of the weekend. [*Id.*]

The investigation was then expanded to include both incidents. Only employees from shift 1 could have accessed the locker room between Burns' trips to his locker that morning. Thus, Edwards met with shift 1 that evening and advised them "this type of harassment is not going to be tolerated."[9] [Record Nos. 30-3, p. 66; 30-6, p. 281] Edwards also advised the facility's supervisors of the incidents and instructed them to "walk through [the] locker room looking for any offensive items . . . prior to your shift and after your shift and report any issues." [Record No. 32-18, p. 8] Long continued reviewing camera footage. [Record No. 32-20, p. 143] By August 13, 2018, she was able to "[n]arrow it down to three" sets of clothes and match those clothes to three employees. [*Id.* at p. 139; *see also* Record No. 30-6, p. 280 (documenting employees' entry and exit of the restroom).]

The following day, a week after the offensive note was found, Long began interviewing employees on shifts 1 and 3. [Record No. 30-6, p. 281] In total, Long scheduled interviews with 19 employees over three days. [Record No. 30-6, p. 281] Long, Johnson, and Cindy

---

[9]     Johnson characterized these warnings from Edwards as "urgent communications." [Record Nos. 32-5; 32-14, p. 63] Burns presented evidence, in the form of an affidavit from A.J. Southerland, another former maintenance technician at Berry, that disputes whether the communications ever occurred. [Record No. 32-13] Berry contends, however, that Southerland did not work with shifts 1 or 3 on the dates in question. [Record No. 33, p. 6]

Newman, Berry's Director of Human Resources, drafted the interview questions.  [*See* Record No. 32-20, pp. 93, 147; 32-24, p. 63.]  The questions included the following: "Have you seen anything questionable, heard anything to make you uncomfortable, and seen anything offensive?"  [Record No. 30-6, pp. 280-81]  Long did not show the employees a picture of either the offensive note or the first noose during the interviews.  [Record No. 32-20, pp. 148-49]

The investigation had not yielded a suspect by August 16, 2018.  [*Id.* at p. 155; *see also* Record No. 30-6, p. 282.]  Berry then directed its efforts toward preventing a future incident.  Supervisors were instructed to continue pre- and post-shift locker room walkthroughs.[10]  A number of changes also were made.  [*See* Record No. 30-6, p. 282.]  First, the camera outside the men's restroom was adjusted to capture full-body images of employees entering and exiting.  [Record Nos. 32-14, p. 69; 32-24, p. 63]  Second, the facility began exploring an alternative location for employees' lockers visible by a camera.  [Record Nos. 30-3, p. 108; 32-14, p. 70; 32-20, p. 155-56]  Long also resolved to set up an "employee recognition team to address the morale issues discovered during interviews," but this idea ultimately failed due to lack of interest and participation.  [Record Nos. 30-6, p. 282; 32-20, p. 230; 32-24, p. 67]

Berry also determined that additional training was necessary.  Long, Johnson, and Edwards scheduled a "[r]efresher training" on Berry's Code of Respect for all employees of

---

[10]    Although Edwards ordered pre- and post-shift walkthroughs to begin on August 11, 2018, Berry did not document them until August 20, 2018.  [*See* Record No. 30-6, pp. 401-41.]  At this point, Berry had directed that the walkthroughs should be conducted hourly by the supervisor on duty.  [Record No. 30-3, p. 112]

the facility.[11]  [*See* Record Nos. 30-6, p. 282; 32-16, pp. 7-12]  The training took place at the beginning of the facility's monthly safety meetings on August 21, 2018, and August 23, 2018. [*See* Record Nos. 30-6, p. 282; 32-20, p. 165.]  And employees unable to attend the regularly scheduled meetings were trained by Long individually.  [Record Nos. 32-14, pp. 271-73; 32-20, p. 166]  A quiz was given at the end of the training session, but it contained no questions concerning the non-harassment policy.  [Record Nos. 32-7; 32-18, p. 78; 32-20, p. 168]

An emotional Burns met with Long and Johnson following the training session. [Record Nos. 32-14, p. 80; 32-20, p. 158; 32-24, p. 70; 30-6, p. 282] Burns stated that he was considering terminating his employment because he felt he could not "focus and work [at the facility] safely."  [*Id.*]  Long and Johnson provided Burns with information about Berry's Employee Assistance Program, and Long offered to meet with him once a week to "check in and see how he was doing."  [Record Nos. 32-20, p. 159; 32-14, p. 81] The two, however, did not provide any updates on the investigation.  [Record No. 32-14, p. 82]

---

[11]     The parties vigorously dispute the nature of these training sessions.  But whether Burns attended the training is not at issue—he signed a roster on August 21, 2018 indicating that he attended "Refresher Code of Respect Training."  [Record No. 32-14, p. 271] The January 2018 version of Berry's U.S. Employee Handbook, Nicholasville, Kentucky, Hourly, "expressly prohibits discrimination, harassment, and retaliation based on race, color, . . . national origin, . . . or any other category protected by law."  [Record No. 32-16, p. 8] Another section instructs that company property "must be kept clean and are to be used only for work-related purposes." [Id. at p. 33] Burns contends that the meeting largely concerned safety training, and that Long merely "flashed" a slide prior to the training that contained a picture of the offensive note and a warning against "defacing company property."  [Record No. 32-14, p. 72] Burns attached an affidavit from a fellow employee to this effect.  [Record No. 32-13] Berry contends that Long, Johnson, and Edwards put on a 10 to 15 minute presentation that included the non-harassment policy and pictures of the offensive note and the first noose.  [Record Nos. 30-1, p. 8; 32-20, p. 160; 30-3, p. 68; 32-24, pp. 52-57]  Nevertheless, Berry notes that even Burns' version of the meeting indicates that it "addressed the harassing behavior in these meetings, even if only briefly, and told employees that such conduct would not be tolerated."  [Record No. 33, p. 7]

**C.      Incident three: a threatening note is found in Burns' personal locker.**

Close to the beginning of his shift on August 24, 2018, Burns discovered a piece of cardboard in his locker with the words "die n___er" written on it ("the threatening note"). [Record No. 32-14, pp. 85-86] He removed the threatening note and delivered it to the night shift supervisor, Donnie Conatser.  [*See id.* at p. 95.]  Conatser notified Edwards, Bowman, and Long, all of whom immediately came to the facility to investigate.  [*See* Record Nos. 30-3, p. 78; 30-6, p. 282; 32-20, p. 178.]

A review of the camera footage narrowed the potential suspects to one employee. Burns estimated that the note was placed between 7:47 p.m. and 9:12 p.m.  [Record No. 30-6, p. 282] Only one of the previously identified suspects, Jeremy Morton, entered the locker room during this window.  [*Id.*]  Based on this information, Edwards and Long questioned Morton and informed him that he was the "only person that could have been in the location all three times and therefore he was being suspended."  [Record No. 32-20, p. 183; *see also* Record No. 30-3, p. 81.]  Morton denied the allegations, and Edwards promised that "if I was wrong I would apologize and he would be paid for his time off."  [Record No. 30-3, pp. 79-80]

After Morton was informed that he would be suspended, Burns was brought up to speed in a brief meeting with Edwards, Bowman, and Conatser.  [Record No. 32-14, pp. 64-65] Thereafter, Conatser was dispatched to escort Morton off the premises while Burns, Edwards, and Bowman continued to meet.  [*Id.* at p. 65] A few minutes later, Burns, Edwards, and Bowman walked from the corporate offices in the front of the facility to the production floor in the rear of the building.  [*Id.*]  Along the way, they crossed paths with Morton and Conatser leaving the facility.  [*Id.*]  Morton took the opportunity to plead his innocence to Burns, and he allegedly made physical threats against Burns for not defending him.  [*Id.* at pp. 65-66]

Burns was fearful; he knew Morton had a company-issued knife in his possession. [*Id.* at p. 66] Fortunately, no physical altercation occurred.

After the interaction with Morton, Burns called the police to report the threatening note incident. [Record No. 32-14, p. 96] An officer arrived at the facility at 11:45 p.m. and spoke with Burns about the offensive note, the first noose, and the threatening note incidents. [Record No. 30-8, p. 7] Edwards was also interviewed. [*Id.*] However, Morton could not be interviewed at the time because he had already left the facility. [*Id.*] Bowman escorted Burns home after providing details to the officer. [Record No. 32-14, p. 93]

The investigation continued over the next few days, with Long again interviewed employees on shifts 1 and 3. [*See* Record Nos. 30-6, pp. 283-84; 32-20, pp. 199-200.] This included asking the same three questions she had asked during the previous interviews. [*Id.*] But again, the interviews failed to yield any new leads. [Record No. 32-20, p. 203] On August 30, 2018, Long advised Burns that there was insufficient evidence to identify Morton as the perpetrator. [Record Nos. 30-6, p. 284; 32-14, pp. 106, 109] Burns was not surprised, as he never believed Morton was responsible. [Record Nos. 30-6, p. 284; 32-14, p. 98] Moving forward, Long assured Burns that Berry was continuing the locker-relocation project. [Record No. 30-6, p. 284] She also indicated that Berry would allow Burns to transition to day shift, but he declined the offer. [*Id.*; Record No. 32-14, p. 142]

Detective Jason Fraddosio called Burns and Edwards on August 30, 2018. [Record No. 30-8, p. 8] He only reached Edwards, who advised Fraddosio that Morton was being asked to return to work due to the lack of evidence against him.[12] [*Id.*] Edwards also stated that, while

---

[12]     Morton declined to return to work and terminated his employment with Berry. [Record Nos. 30-3, p. 90; 32-24, p. 71]

Burns doubted Morton was responsible, Edwards believed Morton was the likely perpetrator. [*Id.*] Burns returned Fraddosio's call on September 4, 2018. [*Id.*] He stated that, "out of all the employees [at the facility], [Morton] is the one I talk to the most" and their relationship was amicable. [*Id.*] Burns further indicated that he did not suspect any other employees were responsible. [Record No. 30-8, p. 9] Long provided Fraddosio with the name of another suspect on September 10, 2018, and she offered to share video footage from the facility. [*Id.*] Ultimately, Fraddosio interviewed Morton and the other suspect, but determined that neither were responsible. [*Id.* at p. 10] During Morton's interview, he stated his belief that Burns was "making these false accusations to file a suit against the company in an attempt to get a settlement." [*Id.*] Based on the interviews, Fraddosio deemed the investigation inactive on September 11, 2018. [Record No. 30-8, p. 11] Berry's internal investigation was also inconclusive. [*See* Record No. 32-20, pp. 198.]

On September 4, 2018, Long checked in with Burns to find out how he was doing. [Record No. 30-6, p. 285] Burns stated that "things are about the same" and Long informed him that the new lockers had arrived at the facility. [*Id.*] Burns and Long did not have any additional meetings.

At some point after Morton was ruled out, Bowman allegedly told Burns that Bell was a suspect. [Record No. 32-14, p. 102-03] Burns reacted just as he had when he heard Morton was a suspect: he had "[n]o reason at all" to believe Bell would have committed the acts. [*Id.* at p. 103] In fact, Burns and Bell rarely interacted because Bell "was the day shift guy." [*Id.*] And Bell was never identified as the perpetrator.

- 11 -

### D.   Four months pass without an incident.

Burns was not involved in any incidents for the remainder of 2018.[13]  [Record Nos. 32-14, p. 110; 30-6, p. 285]  However, on October 30, 2018, he filed a charge of discrimination with the Equal Employment Opportunity Commission.   [Record No. 30-7]   Therein, he recounted the three incidents and stated that he "reported this to management, but the harassment has continued."  [*Id.* at p. 2]

An unrelated incident of harassment occurred in November 2018.  A homophobic note was placed on a Berry employee's workstation.  [Record Nos. 32-20, p. 104-05; 32-15, pp. 94-96] The employee responsible for the note confessed, and he was immediately terminated.  [Record No. 32-20, p. 106] In response to this incident, Berry disseminated an urgent communication throughout the facility concerning its non-harassment policy.  [Record No. 32-19, p. 4] All employees were required to acknowledge their receipt by signing the urgent communication.  [*Id.*]  Burns was not involved in this incident.

---

[13]     Burns' Complaint states that Berry "threatened to suspend" him for having an "expired driver's license."  [Record No. 1, ¶ 34] Burns was asked about this statement in his deposition. He recounted being required to produce a driver's license when he transitioned from a temporary to full-time employee.  [Record No. 32-14, pp. 143-44] After a "lengthy period of time" elapsed, Long informed him that he had provided an expired driver's license.  [*Id.* at 144] Burns did not understand why a diver's license was relevant to his employment, so he "kind of prolonged getting a copy of the updated driver's license."  [*Id.*]  At some point, Long allegedly threatened to suspend him if he did not provide updated identification.  Burns was not suspended, and the situation was resolved after Bowman explained to him that he should provide the identification to Long to satisfy Berry's tax obligations.  [*Id.* at p. 149] Burns appears to no longer press this issue because his response to Berry's motion does not mention it.

### E.     Incident four: a noose is discovered on Burns' toolbox.

Burns was targeted again in early 2019.  He was the "on call" maintenance technician on January 14, 2019.  [Record No. 32-14, p. 110] An issue arose, and he received a call to report to work.  [*Id.*]  When he arrived at 10:00 p.m., his toolbox[14] was partially covered with rags.  [*Id.* at p. 111; *see also* Record No. 32-9.]  This was "nothing out of the ordinary, so [Burns] didn't really think anything of it."  [*Id.*]  But after resolving the maintenance issue, he removed the rags and discovered another rope ("the second noose").  [Record Nos. 32-10; 32-14, p. 111]

Burns was initially not sure how to interpret the rope.  [Record No. 32-14, p. 116] He summoned Jordan Fields, the night shift production supervisor on duty.  [*Id.* at p. 111] Fields then realized he had unknowingly moved the rope earlier in the evening.  When he had found it, the rope was tightened inside the vice on Burns' toolbox.  [Record No. 32-9] The two reconstructed the scene as Fields had discovered it and took photos.  [Record No. 32-14, p. 111] Based on the way he found the rope, it was Fields' opinion that someone placed it in the vice and concealed it with the rags.  [Record No. 32-9]

Fields and Burns reported the incident to management.  They first called Edwards at 10:09 p.m.  [Record Nos. 32-10, p. 1; 32-15, p. 97] Edwards instructed them to take pictures, write up a brief report, and send it to Edwards and Long that evening.  [*Id.*]  Edwards then called Long to "apprise HR of incident and discuss what we needed to do."  [Record No. 32-

---

[14]     Berry's maintenance toolboxes are "very large" wheeled carts.  [Record No. 32-14, pp. 113-14] Each maintenance technician is assigned his or her own toolbox, but the employee's names are not printed on the toolboxes.  Notably, Burns' toolbox was the only one with a vice attached to it.  [*Id.* at p. 114]

10, p. 1] Fields and Burns also reviewed some camera footage, but their review was inconclusive. [Record No. 32-14, p. 117] Edwards received the pictures and report at 10:42 p.m., and he called Burns seven minutes later. [*Id.*; Record No. 32-14, p. 118] Burns informed Edwards (and later Long) that he believed the incident was racially motivated.[15] [Record No. 32-14, pp. 119-120] Long called Burns at 11:40 p.m. and advised him that she would be investigating the incident. [Record No. 30-6, p. 449] Shortly after midnight, Edwards was instructed to interview the employees present during the incident as their shift ended later that morning. [Record No. 32-10, p. 1]

Employees from all four shifts were interviewed over the next few days. Edwards interviewed shift 4 the morning after the incident. [Record Nos. 32-10, p. 6; 32-15, p. 100] He showed the pictures taken the night before[16] and asked: "[h]ave you seen anything about this issue?" and "[h]ave you heard anything about this issue?" [*Id.*] The employees were also instructed to follow up "if they hear anything." [*Id.*] Long interviewed the remaining three shifts in the same fashion. [Record Nos. 32-20, p. 210; 30-6, p. 451] Burns was apprised of the progress of the investigation on January 16, 2019. [*Id.*] Meanwhile, Edwards reviewed camera footage from around the facility to determine who could have put the rope on the toolbox. [Record No. 32-15, p. 103] He also instructed the facility's supervisors to notify him immediately of "any odd items such as slip knots hanging off items . . . that could be construed

---

[15]     This is Burns' recollection of the conversations with Edwards and Long. Edwards' notes state that Burns "didn't know" whether the incident was racially motivated. [Record No. 32-10, p. 1] Long's notes corroborate Edwards' understanding. [Record No. 30-6, p. 449]

[16]     Long stated that it was necessary to show pictures of the racially-motivated incident during these interviews because of her understanding that Burns "was not sure that this even had to do with the other" incidents and was not "sure it was motivated" by his race. [Record No. 32-20, p. 211]

as harassment in any manner." [Record No. 32-19, p. 12] Additionally, the maintenance toolboxes were moved to an area in view of a camera. [*Id.*; Record No. 30-6, p. 451]

Again, none of these efforts identified the perpetrator of the incident. On January 22, 2019, Long met with Burns to inform him that the investigation was complete and inconclusive. [Record No. 30-6, p. 453] He reported that "we are all on the same page and he will just keep trucking along." [*Id.*] Burns' co-workers were also staying vigilant for "anything that looks off." [*Id.*]

### F.    Burns resigns.

Burns did not remain at Berry much longer. He began looking for employment elsewhere after the second noose incident. [Record No. 32-14, pp. 13637] Burns eventually secured a position with Aerotek and tendered his resignation on March 5, 2019. [*Id.*; *see also* Record No. 30-2, p. 238.]

Burns initiated this action on February 6, 2020, naming Berry as the only defendant. He asserts claims for racial discrimination in employment, hostile work environment, employment retaliation, and constructive discharge. These claims are brought pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 2000e ("Title VII"), and the Kentucky Civil Rights Act, Ky. Rev. Stat. § 344.

## II.    THE STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). The operative inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

- 15 -

one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The moving party bears the initial burden to produce evidence that it is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 317. This burden is met simply by showing that there is an absence of evidence on an issue which the nonmoving party has the ultimate burden of proof at trial. *Id.* at 325.

Once the moving party satisfies its burden of production, the burden shifts to the nonmoving party to come forward with "specific facts" that indicate there is a "genuine issue" for trial. *Celotex Corp.*, 477 U.S. at 324; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). This burden requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Keeneland Ass'n, Inc. v. Earnes*, 830 F. Supp. 974, 984 (E.D. Ky. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmovant must "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir.1994) (citation omitted).

"The judge's function is not to weigh the evidence, but to decide whether there are genuine issues for trial." *Moses v. Baker*, 798 F. Supp. 2d 863, 865 (E.D. Ky. 2011) (citing *Anderson*, 477 U.S. at 249). If the burden shifts to the nonmovant, summary judgment is precluded only if a dispute exists over a fact that "might affect the outcome of the suit," not over facts that are "irrelevant or unnecessary." *Anderson*, 477 U.S. at 248. And an issue is "genuine" where the trier of fact could rationally resolve the issue in the nonmovant's favor. *Matsushita Elec.*, 475 U.S. at 586-87.

### III.    LEGAL ANALYSIS

Burns' claims arise under Title VII.  This provision makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The Kentucky Civil Rights Act mirrors Title VII, so Kentucky courts have held that federal law is "most persuasive, if not controlling, in interpreting the Kentucky statute."  *Kentucky Comm'n on Human Rights v. Com., Dep't of Justice, Bureau of State Police*, 586 S.W.2d 270, 271 (Ky. Ct. App. 1979).  Thus, federal courts apply "federal standards for evaluating race discrimination claims" brought under K.R.S. § 344.  *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000).  Additionally, to prevail under 42 U.S.C. § 1981, Burns must satisfy the framework applied to Title VII claims.  *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989); *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).  Therefore, the Court turns to the standards applied to racial discrimination claims under Title VII.

Which standard applies depends on the "unlawful employment practice" alleged.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002).  An employer may have allegedly subjected the plaintiff to an adverse employment action.   In such a case, discrimination may be demonstrated by direct evidence that the action was based on the plaintiff's race or engagement in a protected activity.  *See, e.g.*, *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987).  But where a plaintiff provides circumstantial evidence of a racially-motivated adverse employment action, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

On the other hand, a plaintiff may seek to recover based on the conditions of his or her former employment.   For example, a voluntary resignation may amount to an adverse employment action where working conditions forced the plaintiff to resign.  *See, e.g.*, *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001).  Additionally, a plaintiff may recover by demonstrating a hostile work environment.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

Burns' claims implicate nearly all of these standards.  As previously noted, he contends that he was subjected to racial discrimination, a hostile work environment, retaliation, and that he was constructively discharged.  Berry moves for summary judgment on these claims.  The Court will address Berry's arguments in the order presented.

### A.   Burns' hostile work environment claim fails because Berry's response was adequate.

A hostile work environment is defined broadly.   The Supreme Court has reasoned that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).  Harassment of this variety that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" creates a hostile work environment.  *Id.* at 67 (cleaned up); *see also Harris*, 510 U.S. at 23 ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.").

But not all hostile work environments are actionable.  Burns must establish that: (1) he was a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment created a hostile work environment; and (5)

- 18 -

Berry is liable for the harassment.  *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

Here, Burns is a member of a protected class, and Berry concedes that the four incidents

amounted to unwelcome racial harassment and created a hostile work environment.  [Record

No. 30-1, p. 16]  Thus, the question is whether Berry is liable for the harassment.

### 1.    The co-worker standard of review applies to Burns' hostile work environment claim.

An employer is not *per se* liable for a hostile work environment.  "Depending upon

whether the alleged harasser is a *co-worker* or a *supervisor* of the victim, there are slightly

different standards for evaluating whether the employer as a whole is vicariously liable for the

hostile work environment."  *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 348 (6th Cir.

2005) (emphasis added).  Vicarious liability is automatic where a hostile work environment

was "created by a supervisor with immediate (or successively higher) authority over the

employee."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).   However,

"[e]mployer liability for co-worker harassment is based directly on *the employer's conduct*."

*Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999) (emphasis added).  Liability attaches

only where a plaintiff shows that the "employer knew or should have known of the conduct,

*and* that its response manifested indifference or unreasonableness."  *Jackson*, 191 F.3d at 663

(emphasis added).

As Burns points out, here the harasser was never identified.  Thus, Berry "cannot rule

out supervisor involvement" any more than it can rule out co-worker involvement.  [Record

No. 32, p. 16] As a consequence, the parties vigorously dispute which standard of review the

Court should apply.   Berry contends that "there is no evidence that the incidents were

perpetrated by a supervisor," but Burns responds that Berry "ignores critical evidence . . . that

supervisor Jeff Bell was responsible."[17]  [Record Nos. 30-1, p. 17; 32, p. 16]  In fact, Burns appears to have demonstrated that factual disputes concerning this issue exist.  [*See* Record No. 33, p. 7 (stating Berry's position that Burns' evidence is not credible).]   It is also noteworthy that whether Burns or Berry have the burden of proof on this point is unclear.[18]

But at bottom, the parties' energetic dispute over Bell's potential involvement is immaterial.  The record establishes that Bell was not Burns' supervisor under Title VII.  "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 570 U.S. 421, 450 (2013).  "Tangible employment actions are those that 'effect a significant change in employment status . . . .'"  *EEOC v. AutoZone, Inc*., 692 F. App'x 280, 283 (6th Cir. 2017) (quoting *id.* at 431).  Berry contends that Bell had no authority to take any tangible employment actions against Burns.  [Record Nos. 33, p. 9; 33-4, ¶¶ 3-4]

---

[17]     This evidence includes the following: a previous complaint from an employee "that Jeff Bell was racist"; Bowman's alleged identification of Bell as a suspect; the fact Bell conducted a walkthrough of the locker room "moments before" the threatening note was found; the "curious" missing walkthrough documentation on August 24, 2018; and the fact that the first offensive note was found the day after Burns was hired as a full-time employee.  [Record No. 32, p. 16] Berry disputes each of these claims as "misrepresent[ations] of several aspects of the factual record."  [Record No. 33, p. 1] Burns does not address the fact that Bell initially helped him investigate the first noose incident.  [Record No. 32-14, p. 53]

[18]     Imposing vicarious liability on an employer for "anonymous harassing conduct is a close[]" question that the Sixth Circuit does not appear to have answered. *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 497 (4th Cir. 2015).  The court has sometimes deferred to the plaintiff's suggested standard, *Zeller v. Canadian Nat'l Ry. Co.*, 666 F. App'x 517, 521, 526 (6th Cir. 2016), or adopted the plaintiff's standard after looking to whether the "record supports [the plaintiff's] position."  *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 275 (6th Cir. 2009).  And at least one judge on the Sixth Circuit has argued that plaintiffs bear the burden of showing that the supervisor standard applies.  *See Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 418 (6th Cir. 1999) (Batchelder, J., dissenting in part).  But this Court is not required to draw a conclusion from these precedents to dispose of the current motion.

Burns provides no responsive evidence that could lead a jury to find that Bell was his supervisor.  He merely states that "Bell was a production supervisor."  [Record No. 32, p. 6] Of course, Burns did not work in production.  He testified that his supervisor was Bowman. [Record No. 32-14, p. 22] Burns also referred to Bell as "the day shift guy," said the two rarely interacted, and described their working relationship as collaborative.  [*Id.* at p. 103] Moreover, it is of no consequence that Bell had some authority over *other* employees at the facility. *AutoZone, Inc.*, 692 F. App'x at 284.  Even if a jury could find that Bell was the harasser, Berry would only be vicariously liable if the jury could also find that Bell supervised "the employee[] *he harassed*."  *Id.* (emphasis added).  In this case, the fact that Bell did not supervise Burns is not in dispute.

### 2.    Berry's response to the incidents was adequate.

Having established that the co-worker standard applies, the issue is narrowed even further by the fact that Berry was aware of the harassment.  When an employer is aware of co-worker harassment, its liability turns on its response: only if it "manifests indifference or unreasonableness in light of the facts the employer knew or should have known" will it be held liable.  *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 873 (6th Cir. 1997).  The appropriateness of a response depends on "the frequency and severity of the alleged harassment."  *Jackson*, 191 F.3d at 663.  An adequate response makes "a reasonable attempt to prevent and correct the problem of racially harassing behavior."  *Id.* at 663-64 ("Generally, a response is adequate if it is reasonably calculated to end the harassment.").

In *Waldo v. Consumers Energy Co.*, the Sixth Circuit provided examples of reasonable responses to harassment:

> Steps that would establish a base level of reasonably appropriate corrective action may include promptly initiating an investigation to determine the factual basis for the complaint, speaking with the specific individuals identified by the complainant, following up with the complainant regarding whether the harassment was continuing, and reporting the harassment to others in management.

726 F.3d 802, 814 (6th Cir. 2013) (cleaned up) (quoting *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 633 (6th Cir.2010)).  Importantly, the reasonableness of an employer's response is measured "at the time" of the incidents, and not from the well-informed vantage point of hindsight.  *Blankenship*, 123 F. 3d at 874.

The hallmark of an adequate response to an employee's complaint of coworker harassment is a prompt investigation.  This is "[t]he most significant immediate measure an employer can take."  *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 686 (6th Cir. 2005); *see also Zeller*, 666 F. App'x at 526 (A prompt investigation is "far from indifferent or unreasonable.").  In this case, Berry promptly responded to each of the incidents of harassment.

As outlined above, following the first incident, an investigation was immediately launched by Burns' boss (Bowman), his human resources representative (Long), and the facility's manager (Edwards).  [Record Nos. 30-3, pp. 53-54; 32-20, p. 133]  The day after the incident, Long and Bowman reviewed camera footage while Edwards warned shift 3 against engaging in harassing behavior.  [Record Nos. 32-20, p. 133, 135; 30-3, pp. 57-58]  And Burns was made aware that steps were being taken to identify the harasser.  [Record No. 32-14, pp. 47-48]

Although Berry was still investigating the initial incident when the first noose was discovered four days later, it again took prompt action.  [Record Nos. 32-20, p. 135; 32-14, p. 50]  Long and Edwards spoke with Burns and gave him two days off.  [Record Nos. 32-14, pp.

54, 56, 59, 63] Edwards again warned the shift on duty (shift 1) that Berry would not tolerate harassment, and he ordered supervisors to begin pre- and post-shift locker room walkthroughs. [Record No. 30-3, p. 66; 32-18, p. 8] With the new information from the second incident, Long narrowed the suspects to three employees. [Record No. 32-20, p. 139] Additionally, both shifts 1 and 3 were interviewed within five days of the first noose incident. [Record No. 30-6, p. 281]

Further, Berry undertook preventative measures between the second and third incidents. Security cameras were adjusted to ensure that, should the harasser target Burns' locker again, he would be promptly identified. [Record Nos. 32-14, p. 69; 32-24, p. 63]; *see Zeller*, 666 F. App'x at 526 (installing cameras and similar "physical steps to help ensure [the plaintiff's] safety" contributed to the reasonableness of the employer's response). Plans were made to relocate the lockers entirely. [Record No. 30-6, p. 281] And notwithstanding the parties' dispute over the intensity of the training, all employees attended a training session concerning the harassment. [*See* Record No. 32-14, p. 271.]

Additionally, Berry's response to the third incident adequately reflected its severity. *Jackson*, 191 F.3d at 663. For one thing, Long, Johnson, and Bowman all came to the facility in the middle of the night to begin investigating. [*See* Record Nos. 30-3, p. 78; 30-6, p. 282; 32-20, p. 178.] Based only on the information provided by Burns, a suspect was identified and suspended on the spot. [Record No. 32-20, p. 183]; *see Collette*, 126 F. App'x at 686 (investigation was prompt in part because the employer "immediately suspended [the suspect] pending investigation"). When a police officer arrived, Edwards cooperated with the investigation. [Record No. 30-8, p. 7] Burns was again given the night off and provided an escort home. [Record No. 32-14, p. 93] All employees that could have possibly been involved

- 23 -

(shifts 1 and 3) were interviewed again.  [Record No. 32-20, pp. 199-200] And when a suspect was not identified, Berry offered Burns a transition to day shift.  [Record No. 32-14, p. 142]

The investigation ramped up even further after the final incident.  Again, an investigation was launched immediately, despite the fact that the incident occurred after 10:00 p.m.  [Record Nos. 30-6, p. 449; 32-15, p. 97] This time, Long and Edwards determined to interview every employee about the incident, and the first interviews took place within eight hours of the incident.  [*See* Record Nos. 32-10, p. 1, 6; 32-15, p. 100] Edwards reviewed camera footage from the entire facility and issued an additional directive to supervisors regarding potentially offensive items.  [Record Nos. 32-15, p. 103; 32-19, p. 12]

Burns' individual concerns were addressed throughout these investigations.  For example, he stated that, outside of the individual employee interviews, he "was able to ask for information or request where the investigation [wa]s" at all times.  [Record No. 32-14, p. 108] When he informed Long and Johnson that he was struggling to find someone to talk to about the situation, they referred him to Berry's counseling services and Long offered to meet with him periodically.  [Record No. 30-6, p. 282; 32-14, p. 81] Long checked in twice after the threatening note incident but Burns discontinued the meetings thereafter.  [Record No. 30-6, pp. 284-85]; *see Zeller*, 666 F. App'x at 526 (inconclusive investigation was reasonable in part because the employer "continued to check in on" the employee).  And Burns was given no less than three updates from Long during the investigation into the final incident.  [Record No. 30-6, pp. 451-53]

As the foregoing summary indicates, Berry took prompt action that was reasonably directed at determining the source of the harassing actions.  Berry listened to Burns, investigated his claims, interviewed those potentially responsible, and followed up with him

frequently.  *See Waldo*, 725 F. 3d at 814.  It is unlikely that these actions would manifest indifference or unreasonableness under any circumstances.

Still, Burns takes two issues with the investigations.  First, he chides Berry for not immediately interviewing employees after the offensive note was discovered.  [Record No. 32, p. 19] Specifically, he implies that interviewing employees within the four-day window between the incidents may have prevented the first noose incident.  [*Id.*]  Similar delays after the first noose (three days) and the threatening note (five days) incidents were also allegedly unreasonable.  [*Id.*]

But whether a delay "constitute[s] an unreasonable failure to take prompt corrective action" depends on the circumstances of the particular case.  *Stevens v. U.S. Postal Serv.*, 21 F. App'x 261, 264 (6th Cir. 2001); *see also Collette*, 126 F. App'x at 686 n.4 (collecting cases). And here, Berry has reasonably explained that "interviews took time to schedule" because Long "had to coordinate with the production supervisors on two different shifts to ensure all machines were covered before she pulled employees off the production floor."  [Record No. 33, pp. 10-11] And Long testified that it took several days to review the initial camera footage and identify the employees.  [Record No. 32-20, pp. 133-35] Also, Berry's shift employees do not work every day.  Long testified that this complicated scheduling further.  [*Id.* at p. 145] The record further indicates that interviews were not the first investigative step undertaken. Thus, Burns has merely pointed out that the interviews were delayed, but he has not disputed the reasonableness of these delays.  Under the circumstances presented, the delays were reasonable.  *See Zeller*, 666 F. App'x at 526 (finding investigation prompt where it began "the next week" after the plaintiff reported the incident").

Second, Burns contends that Berry enlisted the wrong investigator. His argument focuses primarily on Long's qualifications to investigate incidences of harassment. [Record No. 32, pp. 3, 20] This argument is misguided for several reasons.

Nothing in the record reflects that Long was the sole investigator of the four incidents. She testified that she frequently sought direction from Johnson and Newman. [*See, e.g.*, Record No. 32-20, pp. 93, 147; 32-24, p. 63.] Edwards and Bowman also assisted with many aspects of the investigation. [*See, e.g.,* Record Nos. 32-20, p. 133; 32-10, p. 6; 32-15, p. 100.] Still, even if Long had worked alone, Burns does not point to any provision of law that deems her unqualified. The fact that Burns wishes Berry had enlisted "an experienced investigator or attorney to lead the investigation" does not mean the law requires it. *Blankenship*, 123 F. 3d at 874 ("[A] harassment victim may not dictate an employer's action . . . .").

Burns also suggests that the investigation was deficient because Long failed to show photos of the first noose or offensive note during interviews with employees. [Record No. 32, p. 7] However, the record indicates that employees were aware of the incidents prior to the interviews. [*See* Record Nos. 32-14, p. 192; 32-20, 148; 30-6, p. 281-84.] Simply put, Long's failure to show seemingly unnecessary photographs during the interviews does not render the investigation unreasonable. Finally, Burns does not contend with the fact that the police investigation also failed to identify a perpetrator. [*See* Record No. 30-8.] This undermines his suggestion that a different investigator would have been more reasonable. And even if a more qualified investigator should have been enlisted, nothing about Berry's choice of Long was unreasonable.

Some of Burns' remaining criticisms flatly misrepresent Berry's response. For example, he contends that, after the threatening note was discovered, "Berry did nothing."

[Record No. 32, p. 21] In reality, Berry immediately suspended an employee based solely on Burns' version of the incident. [Record No. 32-20, p. 183] He also states that Berry failed to "engage in any additional remediation" following the third incident. [Record No. 32, p. 21] Again, however, this is incorrect. Long continued training employees after the threatening note was discovered. [*See* Record 32-14, pp. 271-73.] And Berry eventually moved the lockers to an area within view of a camera. In fact, Burns stated that Berry "dead bolted the locker room, so you couldn't . . . even get in there if you wanted to." [Record No. 32-14, p. 131]

Burns next contends that Berry "failed to diligently implement" its prevention efforts. [Record No. 32, p. 22] While it is true that the incidents continued after some changes, Burns concedes that this fact alone does not render Berry's response unreasonable. [Record No. 32, p. 18]; *Chaney v. Haworth, Inc.*, 802 F. App'x 1006, 1011 (6th Cir. 2020). Instead, he notes that there are no documented locker room walkthroughs on August 24, 2018, the night of the threatening note. [*See* Record No. 32-20, p. 188.] But he also states that this was "the only shift when these inspections weren't done." [Record No. 32, p. 2; *see also* Record No. 30-6, pp. 401-41] Missing one shift over the course of 24 days hardly demonstrates indifference or permissiveness on the part of Berry, which is often shown by *complete* lack of action. *See Jackson*, 191 F.3d at 663 (indifference shown where employer "made no effort to discover the perpetrators" of harassment); *McCombs v. Meijer, Inc.*, 395 F.3d 346, 355 (6th Cir. 2005) (employer's "inaction amounted to indifference").

Again, the Court must consider the whether the response was reasonable under the circumstances. *Chaney*, 802 F. App'x at 1011. Without detailing each action taken, it is enough to note that Berry responded to each incident by amplifying its preventative efforts

against future harassing conduct. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 344 (6th Cir. 2008) (detailing employer's obligation, when "faced with a pattern of harassment," to "both respond appropriately and take increasingly effective steps designed to end the harassment"). And, importantly, "[Burns] does not say what more [Berry] should have done" to prevent the incidents.[19] *Chaney*, 802 F. App'x at 1010.

*   *   *

In summary, Burns was not subjected to supervisor harassment, and Berry's response to his claims of co-worker harassment was adequate under the circumstances. Thus, Berry may not be held liable for a hostile work environment as a matter of law.

> **B.      Berry is also entitled to summary judgment to the extent Burns alleges he was subjected to discrimination based on adverse employment action.**

Burns fails to make out a *prima facie* case of discrimination. Because he alleges no direct evidence of discrimination, the burden-shifting framework applies. Under *McDonnell Douglas*,

> A plaintiff must first set forth a prima facie case of discrimination. The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. If the employer carries this burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination. The ultimate burden of persuasion remains at all times with the plaintiff.

*Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (quoting *Newman v. Fed. Express Corp.*, 266 F.3d 401, 405 (6th Cir.2001)). To establish a *prima facie* case, Burns must

---

[19]      Burns' counsel suggested during Long's deposition that Berry could have assigned someone to shadow Burns. [Record No. 32-20, p. 247] Berry's motion points out that had Burns accepted the transition to day shift, this would have effectively been accomplished because he would have worked with a second maintenance technician. [Record No. 30-1, p. 20 n.13; *see also* Record No. 32-14, p. 28.]

demonstrate that: 1) he is a member of a protected class; 2) was qualified for the job; 3) he suffered an adverse employment decision; and 4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Newman*, 266 F.3d at 406.

Berry contends that Burns cannot make out a *prima facie* case because he was not subjected to an adverse employment action. [Record No. 30-1, p. 22] Burns' response does not address Berry's argument, and the Court could grant the motion on this ground alone. But even if he had addressed this issue, summary judgment in Berry's favor would be appropriate on the record before the Court. In his Complaint, Burns accuses Berry of "taking adverse employment action against him" "[i]n response to [Burns'] complaints about the racially hostile work environment." [Record No. 1 ¶ 60] Yet, during his deposition, Burns denied ever being subjected to any employment action based on his race. [Record No. 32-14, pp. 138-39] In short, Burns has failed to demonstrate that he was subject to an adverse employment, and Berry is entitled to summary judgment. *See Blackwell v. Prod. Action Int'l, Inc.*, No. CIVA 04-231 KSF, 2006 WL 3747519, at *13 (E.D. Ky. Dec. 18, 2006).

### C.    Burns was not constructively discharged.

A constructive discharge claim presupposes that a plaintiff has properly alleged racial discrimination. It is essentially an aggravated race discrimination claim: an employer "must *deliberately* create intolerable working conditions, as perceived by a reasonable person, with the *intention* of forcing the employee to quit[,] and the employee must actually quit." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (emphasis added). The "reasonably foreseeable impact of [the employer's] conduct on the employee" helps determine whether the employer's actions were deliberate or intentional. *Yates v. Avco Corp.*,

819 F.2d 630, 637 (6th Cir. 1987) ("[T]he feelings of a reasonable employee would not be enough to show discharge without at least some foreseeability on the part of the employer."). In this case, Berry concedes that Burns may have reasonably felt compelled to resign, but it contends that Burns has shown neither the predicate discrimination nor its intent to make him resign.  [Record No. 30-1, pp. 22-24]

The lack of merit of Burns' racial discrimination claims doom his constructive discharge claim.  This Court has held that, where a plaintiff's "underlying claim of racial discrimination is without merit, [] so, too, is h[is] claim of constructive discharge." *Blackwell*, 2006 WL 3747519, at *15.  As the above analysis reflects, Burns has failed to establish that he was subjected to actionable race discrimination or hostile working conditions.  Thus, he has no viable claim for constructive discharge. *See Starks v. New Par*, 1999 U.S. app. LEXIS 9145, at *15-16 (6th Cir. 1999) (unpublished table decision) (where a plaintiff "fails to make a *prima facie* case of racial harassment, there is no underlying claim to support a claim of constructive discharge").

Next, even if Burns had properly alleged a predicate claim, there is no evidence of aggravating factors. *See Geisler v. Folsom*, 735 F.2d 991, 996 (6th Cir. 1984).  Burns seemingly intends to show animus by pointing out that Berry's investigations into the incidents were inconclusive, and further claiming that it "did nothing to curtail these threats."  [Record No. 32, p. 22]   But these assertions are insufficient to create an issue of material fact. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 887 (6th Cir. 1996) ("[U]nsupported accusations of antagonistic, hostile conduct on the part of the defendant" do not create an issue of material fact on a constructive discharge claim.).

- 30 -

Burns completely fails to demonstrate that Berry allowed the harassment to continue, and the record leads to the opposite conclusion.  In response to each incident, Berry's actions manifested respect for Burns' concerns and demonstrated to other employees that harassment would not be tolerated.  Berry employees frequently checked in with Burns, and he stated that he was always able to get information about the investigations.  [Record No. 32-14, p. 108] When Burns helped identify a suspect, the employee was suspended without additional investigation.  [Record No. 32-20, p. 183]

Additionally, the fact that the suspect was not identified does not suggest that Berry intended for Burns to resign.  Burns repeatedly points out that the harassment began "day after he became a full-time employee."  [Record No. 32, pp. 1, 22] This may illustrate the severity of the incidents, but it does not support an inference that Berry condoned them.  Importantly, nothing about Burns' employment changed when he transitioned from a temporary to a full-time employee.  [Record No. 32-14, pp. 24-25; 30-31] Moreover, even if Burns' resignation was foreseeable, there is nothing about *Berry's* conduct that would have contributed to that expectation.  *See Yates*, 819 F.2d at 637.  Berry was more likely to expect the opposite, considering Burns stopped checking in with Long about the situations for nearly four months prior to the final incident.  [Record No. 30-6, p. 285] Thus, Burns has failed to demonstrate that he was constructively discharged.

### D.   Burns has not demonstrated that his brief, coincidental encounter with Morton was a retaliatory action.

Burns fails to make out a *prima facie* case of retaliation.  To do so, he must show:

(1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of his civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there

- 31 -

was a causal connection between the protected activity and the adverse employment action.

*Wrenn*, 808 F.2d at 500. "As is often the case with retaliation claims," Berry focuses on the "final aspect of a prima facie case—the element of causation." *Wingo v. Michigan Bell Tel. Co.*, 815 F. App'x 43, 46 (6th Cir. 2020). Thus, to be actionable, Berry's allegedly retaliatory action must be causally connected to a protected activity. To show that it was, Burns must "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity." *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997); *see also Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981) ("[T]he plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination."). Specifically, the evidence put forth must show that the retaliatory action would not have occurred but-for the protected activity. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

Burns' failure to allege an adverse employment action also forecloses any claim for retaliation. "Adverse employment actions are typically marked by a significant change in employment status, including hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (quotation omitted). The act of retaliation Burns alleges—the interaction with Morton—did not result in any change in his employment status. [*See* Record No. 32-14, p. 149 (stating Burns was never suspended), 159.] He remained in the same role for seven months after the alleged retaliation. Thus, he has failed to demonstrate that he was subjected to an adverse employment action (and, by extension, retaliation) related to the encounter with Morton.

Nevertheless, the Court will address Berry's contention that Burns failed to establish causation. On this point, the only evidence Burns provides is his own, self-serving testimony. Record No. 32, p. 23] He contends that after the threatening note incident, he was "paraded through [the facility] and allowed to interact with [Morton]." [*Id.*] Burns stated during his deposition that he "felt" that Berry set up the encounter to encourage him to "make a punch or get in a fight so they can get rid [of] two people over the situation." [Record No. 32-14, p. 184] However, he acknowledged that this feeling was out of step with the fact that, throughout the investigations, Edwards encouraged him to "come in and work safe, you know, kind of keep [my] head down."[20] [*Id.*] Nevertheless, Burns believed that "Berry retaliated against him by knowingly exposing him to great physical harm, or possibly death." [Record No. 32, p. 23]

Burns' subjective belief is not corroborated by the record. Even when viewed most favorably to him, there is no evidence from which a jury could infer that he was set up. First, Berry's actions were efforts to *prevent* an interaction. For example, Morton was informed that he would be suspended without Burns present. [Record No. 30-3, p. 81] Then, Edwards, Conatser, and Bowman met with Burns privately to apprise him of their conclusion. [Record No. 32-14, pp. 64-65] The three remained isolated in an office while Conatser was dispatched to escort Morton out of the facility. [*Id.* at p. 65] These actions do not support an inference that Burns was deliberately placed in Morton's path.

---

[20]    Although Burns here referred to Edwards as mostly supportive, at other times he contended that Edwards downplayed his concerns about the first incident. [Record No. 32, p. 2; 32-14, p. 82] As mentioned previously, Edwards disputed Burns' negative characterization in his deposition. But to the extent it is relevant here (an argument Burns does not make), the Court notes that it would not establish that Berry intended to set up the interaction with Morton.

Second, Burns was shadowed before, during, and after the incident.  He was escorted by Edwards and Bowman through the facility.  [*Id.* at p. 65] Additionally, all three supervisors were present during the encounter with Morton.  [*Id.*]  And later that evening, Bowman escorted Burns off the premises and to his home.  [*Id.* at p. 93] From the time it became aware of the threatening note to the time Burns made it home, Berry took steps to ensure his safety.  Accordingly, Burns' uncorroborated characterization of a coincidental interactional with the suspected harasser is insufficient to demonstrate retaliation.

## IV.    CONCLUSION

When the evidence is viewed in the light most favorable to the plaintiff, there is no question that Burns experienced distressing and inexcusable conduct at the hands of an unidentified individual.  And none of the analysis set out above is intended to minimize or undermine the severity of that experience.  But just as the Court has endeavored to respect these allegations, Berry responded to them with the respect and deference due to Burns.  While its reasonable efforts to identify the harasser may be faulted as being unsuccessful, Berry was far from indifferent to the situation presented.  Accordingly, for the reasons explained herein, it is **ORDERED** that the defendant's motion for summary judgment [Record No. 30] is **GRANTED**.

Dated: March 9, 2021.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky

- 34 -